UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CASSANDRA WELCH, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 1:11-cv-00891-LJM-TAB |
| ELI LILLY & COMPANY, | ) ) ) |
| Defendant. | ) ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant Eli Lilly & Company's ("Lilly's") Motion for Summary Judgment on the claims brought against it by Plaintiff Cassandra Welch ("Welch") pursuant to 42 U.S.C. § 1981. In this lawsuit, a companion to the cause styled *Welch v. Eli Lilly & Company*, Cause No. 1:10-cv-01705-LJM-TAB, which was resolved by a jury verdict in favor of Lilly, Welch contends that Lilly retaliated against her after it terminated her employment when it provided negative references for Welch and when Lilly employee John Livingston ("Livingston") provided negative information about Welch's husband, Brian Welch ("Brian"), to his employer, the U.S. Secret Service.

The Court has considered the parties' arguments and for the reasons stated herein **GRANTS** Lilly's motion.

**I. BACKGROUND**

Pursuant to a stipulation by the parties filed in that cause styled *Welch v. Eli Lilly and Company*, Cause No. 1:10-cv-1705-LJM-TAB ("*Welch I*"), the Court starts with the following: Welch originally filed this action on April 20, 2006, stating an intent to seek

class action status. In 2010, Lilly filed a motion to deny class certification and Welch voluntarily withdrew her request to proceed as a class action. *See Welch I*, Dkt. No. 179. In a complaint filed on December 23, 2010, Welch continued to pursue her claims for racial discrimination, retaliation and racial harassment based on the termination of her employment by Lilly on June 8, 2004. *See, generally Welch I.* On March 2, 2010, in *Welch I*, Welch sought leave to amend her individual complaint to add allegations of retaliation that occurred after her discharge. *Id.*, Dkt. No. 18. The Court denied the motion. *Id.*, Dkt. No. 28. On June 30, 2011, Welch filed the Complaint at issue here alleging that Lilly retaliated against her following her discharge in violation of 42 U.S.C. § 1981. *Welch v. Eli Lilly & Company*, Cause No. 1:11-cv-00891-LJM-TAB, Dkt. No. 1 ("*Welch II*").

Welch was employed by Lilly from August 1992 until June 2004, at which time Lilly terminated her employment.

### A. UNDERLYING ALLEGATIONS IN *WELCH I*

The following facts are taken, in large part, from the Background section of the Court's Order on Defendant's Motion for Summary Judgment in *Welch I*, Docket No. 122. In that case, Welch contended that several supervisors discriminated against her on the basis of her race, created and/or tolerated a racially hostile work environment and/or retaliated against her because she complained about racial discrimination. *Id.* at 1. The supervisors she alleged had discriminated against her, created a hostile work environment, and/or retaliated against her included Candy Bowsher ("Bowsher") (Welch's supervisor from January 2001 through October 2002), Todd Elliott ("Elliott"), James Stefanek ("Stefanek") and James Telford ("Telford") (the latter three supervised

Welch from October 2002 through her discharge in June 2004).  *Welch I*, Dkt. No. 122, at 1-15, 27-49.  Welch also alleged that several human resources persons ignored her claims of discrimination, failed to properly investigate her claims and/or expressed discriminatory animus themselves, including Christopher Gunn ("Gunn"), Denola Burton ("Burton"), Pedro Granadillo ("Granadillo"), Robert Klee ("Klee"), Daniel Neumann ("Neumann"), Brad Redmon ("Redmon"), Mike Roesner ("Roesner") and Adam Hemmings ("Hemmings").  *Id.* at 1-15, 27-49.

In particular, Welch alleged the following discriminatory animus:  Welch asserted that Bowsher had displayed discriminatory animus multiple time by using the term "nigger" in a conversation with a co-worker in Welch's work area, repeatedly referring to Welch as "you people" or "people like you," and by telling Welch that blacks did not deserve to paid as much as whites.  *Id.* at 1-3.  Further, Welch claimed that she found an "Aunt Jemima" syrup label in her workspace with a note on it stating something about having talked to her "mama."  *Id.* at 3.  In addition, Welch claimed that Elliott told her to get the gunnysack off of her back when she complained about racial discrimination, encouraged her not to report finding a black doll with a noose around its neck at her workspace and commented to her, right before she was discharged, "We got your black ass now."  *Id.* at 4-6, 9-15.  With respect to Stefanek, Welch alleged that he called Lilly's corporate managers "yahoos [who] can't tell us how to run it over here," which Welch took to mean that the Lilly policies and guidelines did not apply to black people, just white people.  *Id.* at 10.  Roesner, Welch's human resources representative, told her that senior level managers were "nigger lovers" and he would not address her racial discrimination concerns.  *Id.*  Further, Telford repeatedly referred

3

to Welch as "girlfriend," despite the fact that Welch had told him on two occasions the term bothered her because it was "a black slang thing." *Id.* at 12.  Welch claimed that Telford used the term during the meeting at which she was fired. *Id.*  Moreover, Welch alleged that human resources representative Hemmings, who performed the investigation that led to her discharge, told her that he would not take the word of a black woman over that of a white man during his investigation. *Id.* at 31.  Welch also claimed that white male co-workers would break gas in front of her desk and then comment that she should familiar with the smell as a black person. *Id.* at 12.

In April 2004, another Lilly employee, Bryan Mitchell ("Mitchell"), complained to Hemmings that Welch was harassing him at work. *Id.* at 13.  Hemmings initiated an investigation into Mitchell's claims, which included obtaining documentary evidence from Mitchell. *Id.*  Hemmings also interviewed Welch and received documentary evidence from her. *Id.* at 13-14.  Welch further filed a counter-complaint of harassment against Mitchell that Hemmings incorporated into his investigation. *Id.*

In comparing copies of electronic mail he received from Mitchell with copies of electronic mail he received from Welch, Hemmings noticed that some of the messages appeared to have been sent and/or received at the same time, but the content was different. *Id.* at 14.  Using the help and investigative method of a Lilly Information Technology Security Consultant, Patrick "Butch" Gorsuch ("Gorsuch"), both Gorsuch and Hemmings concluded that Welch had altered some of the electronic messages she submitted to Hemmings. *Id.*  Even though Welch had told Hemmings that she had shared her electronic mail password with Mitchell and that Mitchell had altered the

documents, Hemmings still concluded that Welch had falsified the messages. *Id.* at 13-14.

Misconduct, which includes falsification of documents, is grounds for immediate discharge at Lilly. *Id.* at 15. Therefore, based on the evidence he had gathered, Hemmings recommended to Telford and Roesner that Welch be discharged for misconduct. *Id.* Hemmings and Roesner met with Welch on June 8, 2004, to advise her of Hemmings' investigation results. *Id.* Later that day, Telford and Roesner met with Welch and terminated her employment.[1] *Id.*

### B.  WELCH'S POST-EMPLOYMENT CLAIMS OF RACE DISCRIMINATION

#### 1.  Livingston Contacts the U.S. Secret Service

Livingston was a Lilly employee and testified that both he and Welch worked for Scott Huston ("Huston") and then Bowsher for approximately two years. Livingston Dep. at 7-8.[2] Livingston further testified that he worked directly with Welch on one of his projects and that, at some point, Bowsher had asked Livingston for his appraisal of Welch's performance on that project. Livingston Dep. at 11-12. Livingston also testified that he and Welch interacted socially during the time they worked together and may have had lunch together after Welch had left Lilly. *Id.* at 8-11, 27. In addition to several

---

[1] Lilly's Motion for Summary Judgment in *Welch I* was granted in part and denied in part. *Welch I*, Dkt. No. 122, at 1. Welch's claims for racially discriminatory discharge, racial harassment and retaliation went to trial starting on September 23, 2013. *Id.* Dkt. No. 182. On October 1, 2013, the Jury returned a verdict in favor of Lilly on all of Welch's claims against it. *Id.* Dkt. No. 189. The Court entered judgment in *Welch I* in accordance with the Jury's verdict. Dkt. Nos. 192 & 193.

[2] The parties provided different pages of Livingston's deposition testimony. Welch's proffer is found at Docket No. 76-9; Lilly's proffer is found at Docket No. 70-6. In large part the proffers overlap, but there are different pages in each. Therefore, rather than cite to the individual proffers, the Court will cite to "Livingston Dep." with the relevant page number to streamline this Order.

lunches with Welch, socially, Welch and her husband Brian had attended Livingston's church in or around 2000 to 2001 at least once, but Livingston was not there at the time. *Id.* at 8, 10.  Further, Livingston invited Brian to go on a men's canoe trip with his church and Brian went.  *Id.* at 8.  In addition, Livingston put Brian in contact with the Secret Service.  *Id.*  Moreover, Livingston and his family had been invited to a Christmas party at Welch's and Brian's home.  *Id.*  Livingston testified that he and Welch were not close friends; they would chat via instant message on occasion and they had lunch once after either he or Welch left Bowsher's group.  *Id.* at 10.  He also recalled having lunch with Welch either immediately after she left the company or as she was leaving the company.  *Id.*

Welch attests that in the summer of 2002, Livingston told her that he had previously worked with a Lilly employee who shared the same name as Welch's husband.  Dkt. No. 76-3, Welch Decl. ¶ 5.  In addition, Livingston told Welch that the other Brian Welch was terminated after Livingston and his former Team Leader, Lora Remy ("Remy"), reported to Lilly that the other Brian Welch was embezzling money from the company.  *Id.*  She also attests that Livingston had introduced Welch to the other Brian Welch's wife, who was also a Lilly employee.  *Id.*  Welch also attests that Livingston knew that Welch had complained about race discrimination at Lilly, including her complaints about Bowsher, because Welch had told him about them.  *Id.* ¶ 4.

As stated above, Lilly discharged Welch on June 8, 2004.

On July 14, 2004, Livingston contacted Brian's employer, the U.S. Secret Service, and reported that Brian had been fired by Lilly for acts of dishonesty. Livingston Dep. at 15-16 & Ex. 27-A thereto.  Livingston testified that he had heard that

6

Brian had been terminated from Lilly and that there had been some kind of charges that could have been brought against him, but were not. *Id.* at 16-17. Livingston stated that he was unaware of more than one Brian Welch working at Lilly, but he thought that Welch's husband had worked at Lilly. *Id.* at 17. In addition, Livingston testified that he had never worked with a Brian Welch at Lilly. *Id.* at 20.

Livingston stated that he reported the information he had learned about the Brian Welch who had been fired from Lilly because "having had a security clearance [him]self, [he] thought that . . . [it was] information that the Secret Service should have [about] an employee." *Id.* at 15. *See also id.* at 20-21. He further testified that he made the report "as a concerned citizen." *Id.* at 20.

As a result of Livingston's report, on October 14, 2004, the Secret Service placed Brian on administrative leave. *Id.* Ex. 27-A. After an investigation, the Secret Service learned that another Brian Welch had been terminated from Lilly, but it was not Welch's husband Brian; Welch's husband had never worked at Lilly. *Id.* Further, the Secret Service returned Brian to full duty status on October 19, 2004. *Id.*

### 2. **Welch Files a Complaint with the Indiana Civil Rights Commission & a Lawsuit Against Lilly**

On October 4, 2004, Welch filed a complaint of race discrimination with the Indiana Civil Rights Commission ("ICRC") naming Lilly as the Respondent. Welch Dep. at 203 & Ex. 79, thereto.[3] As discussed above, Welch filed her individual and class

---

[3] Similarly to the situation with Livingston's deposition, in support of their arguments the parties proffered various excerpts from Welch's deposition taken on February 4, 2008 ("Welch Dep.") and from Welch's supplemental deposition taken on June 1, 2013 ("Welch Supp. Dep."). *See* Dkt. Nos. 70-1, 70-2 & 76-2 (Welch's Dep.); Dkt. Nos. 70-5, 76-10 & 79-2 (Welch Supp. Dep.). The Court will cite to "Welch Dep." or "Welch Supp. Dep.", rather than to the parties' individual proffers to streamline this Order.

7

claims in this Court on April 20, 2006; and later filed individual claims on December 23, 2010; and June 30, 2011.

### 3. Lilly Provides Welch's Prospective Employers with Negative Information About Her Employment at the Company

Roesner testified that when a prospective employer inquires about the employment history of a former Lilly employee, Lilly's practice is to provide only the former Lilly employee's date of employment and last title or last position held. Roesner Dep. at 52, 129-30.[4] Roesner further testified that there is a centralized process in the Lilly human resources department through which employment history inquiries are funneled. *Id.* at 52.

Welch testified that after Lilly terminated her employment, she applied to thousands of jobs without success. Welch Supp. Dep. at 26. Welch asserts that she was well qualified for many of these positions based on her professional experience both at Lilly (twelve years) and the Department of Defense (twelve years). Welch Dep. at 67; Welch Supp. Dep. at 27-28. For example, she applied for, but was unsuccessful in attaining positions in the pharmaceutical and medical device industries. Welch Supp. Dep. at 41-42.

Sometime in late 2004, Welch made an employment verification inquiry about herself by calling the Lilly main number and asking for Elliott. Welch Dep. At 68; Welch Supp. Dep. at 74-75. Welch testified that she asked for an employment verification from Elliott and he shared the information that she had been terminated. Welch Dep. at 69-70. Similarly, around the same time, Welch was present when a temporary agency

---

[4] Again, the parties proffered various portions of Roesner's deposition to the Court. *See* Dkt. Nos. 70-3, 76-6 & 79-1. To streamline this Order, the Court will cite to "Roesner Dep." regardless of which party proffered the cited page(s).

counselor with whom she was working talked with Elliott. Welch Dep. at 71-73. Welch testified that Elliott told the counselor that he would never recommend Welch for employment because she had been fired for falsifying documents. *Id.*

In 2006, Welch applied for a position with the U.S. Department of Homeland Security ("DHS"). *Id.* at 60-62. Welch was tentatively offered a position at DHS contingent, in part, on a background check. *Id.* at 547. As part of that process and pursuant to a written release signed by Welch, DHS contacted Lilly. *Id.* at 75-77, 547; Roesner Dep. at 50-51, 76. Roesner told a DHS officer Welch's dates of employment, her title and the reason for her separation, specifically, falsification of records. Roesner Dep. at 51, 76-77.

In a separate inquiry, DHS asked Welch if she had ever been dismissed from an employer or if she had ever left employment by mutual agreement. Welch Dep. at 546 & Ex. 97, at 6. Welch's responses conflicted with other information she had provided to DHS, and DHS declined to hire her in October 2006. Welch Dep. at 546, 551, 562-63, Ex. 97 at 6, Ex. 102 at 10 & Ex. 104 at 1, thereto. Welch appealed DHS' decision. Welch Dep. at 567 & Ex. 105 thereto. In its December 22, 2006, response to Welch's appeal, DHS further explained, "[Welch] was unsuitable for employment based on misconduct in prior employment." Welch Dep. Ex. 106. Welch settled that appeal. Welch Supp. Dep. at 67-71.

In addition to DHS, Welch contends that Lilly provided adverse references to the following prospective employers or employment agencies that had tentatively offered Welch a position contingent upon employment and/or background checks, but that rescinded the offer after conducting such a check: Robert Half, *id.* at 75-77;

9

CyberCoders; *id.* at 80-82; American Hotel Register Company ("AHRC"); *id.* at 82-85; Deloitte and Touche, *id.* at 85-86; IBM, *id.* at 86-87; AT&T, *id.* at 87-90; RGS, *id.* at 90-92; U.S. Government Services Agency, *id.* at 92-93; Northrup Grumman, *id.* at 93-95; Lockheed Martin, *id.* at 95-97; Macy's, *id.* at 97-99; Safeway, *id.* at 99-100; NTT Data, Inc./Pirko Group, *id.* at 100-103; Welch Decl. ¶ 6; Wal-Mart, Welch Supp. Dep. at 103-05; Giant, *id.* at 105-06; Kelly Services, *id.* at 106-07; and Mergis Group, *id.* at 107-08. Further, a contingent offer from the Fairfax County Government in Fairfax, Virginia, was rescinded following employment verification in approximately June 2007.  *Id.* at 77-80. Welch states that she has no criminal record.  Welch Dep. at 47-48; Welch Supp. Dep. at 9.

With respect to the Fairfax County position specifically, Welch testified that interviewers there told her they had received feedback from Lilly in or around June 2007. Welch Supp. Dep. at 77-80; Dkt. No. 1, Complaint ¶ 52.  As to the contingent offer from AHRC, which occurred in or around April 2008, Welch testified that an unnamed regional sales manager at the company knew "many Lilly people" and told her that he had spoken with an unnamed person at Lilly.  Welch Supp. Dep. at 82-83; Dkt. No. 1, Complaint ¶ 53.  Further, an AHRC recruiter named Shelley also told Welch that her "Eli Lilly position carried a lot of weight" and "was certainly a factor."  Welch Supp. Dep. at 84.  Further, Welch testified that as to the Macy's position, which was tentatively offered in or around October 2009, an unnamed manager told her that "based on his communication with Eli Lilly that he would not be able to offer [her] the job."  *Id.* at 97-98; Dkt. No. 1, Complaint ¶ 54.  Similarly, in her deposition Welch testified that the

10

manager for the position at Cybercoders,[5] which may have been a contingent offer Welch received in or around October 2010, told Welch he or she had received information from Lilly through Welch's prior information technology manager. Welch Supp. Dep. at 80-82; Dkt. No. 1, Complaint ¶ 55.

## II. **STANDARDS**

### A. SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

---

[5] During her second deposition Welch testified about her application process at Cybercoders; however, her Complaint alleges that Lilly provided a false negative and retaliatory reference to a company named American Cybersystems. Dkt. No. 1, Complaint ¶ 55. There is no evidence in the record with respect to an offer from American Cybersystems; therefore, the Court will presume that American Cybersystems and Cybercoders are the same entity.

11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at

trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### B. RETALIATION UNDER § 1981

Generally, claims brought pursuant to 42 U.S.C. § 1981 are analyzed in the same way as those brought pursuant to Title VII of the Civil Rights Act of 1964. *See Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). However, Welch argues that a different standard should apply to her retaliation claim under § 1981 after the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013). Specifically, Welch argues that the pre-*Nassar* "motivating factor" standard should apply to her claim under §1981 because the *Nassar* court specifically distinguished Title VII's language from that of § 1981. Dkt. No. 85, Welch's Sur-Reply at 7-9. Welch argued the same thing in *Welch I*. *Welch I*, Dkt. No. 122, at 36-38. This Court concluded in that case that the Seventh Circuit would apply the reasoning in the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), "that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law," *Fairley v. Andres*, 578 F.3d 518, 525-26 (7th Cir. 2009), the the question. *Welch I*, Dkt. No. 122, at 37-38. Further, the Court conclude "that, after *Nassar*, Welch is required to show 'but-for' causation for her retaliation claim under § 1981." *Id.* Section 1981 has a different statute of limitations than Title VII, however, which is four years. *Smith v. Bray*, 681 F.3d at 896 n.2 (citing *Jones v. R.R. Donnelley*

*& Sons Co.*, 541 U.S. 369, 382; *Dandy v. United Parcel Serv., Inc.*, 388 f.3d 263, 269 (7th Cir. 2004)).

To prove her retaliation claim, Welch may proceed under either a "direct" or an "indirect" method of proof. *Id.* at 896 (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). Here, Welch is proceeding under the direct method of proof. Dkt. No. 76, at 16. Therefore, to survive Lilly's summary judgment motion, Welch "must present direct evidence of (1) [her] statutorily protected activity; (2) a materially adverse action taken by [Lilly]; and (3) a causal connection between the two." *Bray*, 681 F.3d at 896 (citing *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)).

With respect to a materially adverse action, Welch must show that Lilly's action "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). Further, "the adverse action must materially alter the terms and conditions of employment." *Id.* (quoting *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001)).

To show a causal link, Welch must present evidence of a direct retaliatory motive or present "a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work." *Id.* at 901. *See also Hobgood v. Illinois Gaming Bd.*, 722 F.3d 1030, 1038 (7th Cir. 2013), republished at ___ F.3d. ___ (7th Cir. July 16, 2013). This evidence could include "'(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence that similarly situated employees outside the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason

14

for the adverse employment action.'" *Hobgood*, 722 F.3d at 1038 (quoting *Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013) (further citations omitted)). *See also Bray*, 681 F.3d at 901. This list is neither exhaustive nor required, but, in the end, "[Welch] must present admissible evidence that, when taken as a whole and viewed in a light most favorable to [Welch's] case, could convince a reasonable jury that [s]he was the victim of unlawful retaliation." *Hobgood*, 722 F.3d at 1038.

### III. DISCUSSION

#### A. WELCH'S CLAIMS PREDATING JUNE 30, 2007

Lilly argues that § 1981's four-year statute of limitations bars Welch's claims of retaliation prior to June 30, 2007, because the Complaint was filed on June 30, 2011. Specifically, Lilly contends that Welch's claims regarding Livingston's reports to the Secret Service in 2004 about Brian Welch; Elliott's alleged statements in late 2004 to her and the temporary agency counselor about the reasons for Welch's termination; the DHS' rescission of a conditional job offer in 2006; and the contingent offer from the Fairfax County Government in sometime in June 2007; are barred.

Welch asserts that the continuing violation doctrine applies to all of these incidents. She claims that "[t]he Seventh Circuit has recognized a continuing violation where the employer's conduct is so covert that its discriminatory conduct 'is not immediately apparent.'" Dkt. No. 76, at 31 (citing *Place v. Abbott Labs.*, 215 F.3d 803, 808 (7th Cir. 2000) (further citation omitted)). Welch argues that she was unaware of Lilly's retaliatory acts with respect to her post-termination employment opportunities until a pattern emerged. *Id.* at 31-32. She also avers that the Supreme Court supports a conclusion that acts outside the statutory time frame may be used to support a timely

claim. *Id.* at 32 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

The Court agrees with Lilly that all of the incidents of alleged retaliation prior to June 30, 2007, are barred by § 1981's four-year statute of limitations. Welch's argument that she was unaware of the alleged retaliatory acts until a pattern emerged is unavailing in light of her own testimony that she made her own call to Lilly in 2004 because she was concerned about what Lilly would say about her employment if asked. Welch Dep. at 68-69; Welch Supp. Dep. at 74-75. Welch also claims she witnessed Elliott's statements to the employment agency counselor in late 2004. Therefore, Welch cannot claim that she was unaware of potentially negative references from Lilly until mid-2007. Further, there is no evidence in the record that Welch was unaware that a Lilly employee had contacted the Secret Service in 2004 about alleged misconduct by her husband Brian Welch; to the contrary, Welch included this allegation in the charge she filed with the Equal Employment Opportunity Commission ("EEOC") in April 2005. Welch Supp. Dep. at 110-11 & Ex. 144, thereto. Similarly, with respect to Roesner's comments to the DHS, contrary to her statements here, Welch was on notice of those statements by at least December 2006 when her then-counsel in the putative class action requested information about those comments claiming that they were relevant to Welch's suit. Welch Dep. at 562-65; 567 & Exs. 104-06, thereto.

Furthermore, after *Morgan*, the continuing violation doctrine does not save the pre-June 30, 2007, incidents. Under *Morgan*, "only incidents that took place within the timely filing period are actionable." *Morgan*, 536 U.S. at 114. And, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts

alleged in timely filed charges." *Id.* at 113.  Here, any allegedly retaliatory act prior to June 30, 2007, is time barred, even if Welch claims it is related to acts after that date, such as the withdrawal of later contingent job offers.

For these reasons, Welch's claims of retaliation related to the following incidents are time-barred: (1) in 2004 when Livingston reported erroneous information to the Secret Service;[6] (2) in 2004 when Elliott allegedly provided information regarding her discharge in response to Welch's inquiry and that of an employment agency counselor;[7] (3) in 2006 when Roesner provided information regarding her discharge to the DHS; and (4) in 2007 when the Fairfax County Virginia government withdrew its contingent offer after an employment check.[8]

---

[6] Even if not time-barred, this incident is not actionable because there is no evidence that Livingston was acting on behalf of Lilly when he reported the erroneous information to the Secret Service, in part because there is no evidence that Livingston had any authority to change the conditions of Welch's employment as a "supervisor" at any time. *See Vance v. Ball State*, ___ U.S. ___, No. 11-556, 2013 WL 3155228, at *5 (2013) (utilizing agency principles to establish liability in harassment cases); *Williams v. Banning*, 72 F.3d 552, 553-55 (7th Cir. 1995) (explaining that employer liability stems from traditional principles of respondeat superior).  This incident is also not actionable because Welch has no evidence that her reports or allegations of racial discrimination, which never mention Livingston, motivated Livingston to make the Secret Service report.  *See Bray* 681 F.3d at 900-01 (discussing the requirement that the causation element is met only when the reason is related to a plaintiff's complaints about discrimination).

[7] Even if these incidents were not time-barred, Welch has presented no evidence that they resulted in an adverse employment action.  To the contrary, Welch's own testimony suggests that she continued to apply for a large number of positions.  *See* Welch Dep. at 26.  Therefore, her claim regarding retaliation as to these incidents fails for that reason as well.  *See Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 559 (7th Cir. 2008); *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002).

[8] This claim would also fail even if the statute of limitations was not a bar because Welch has no admissible evidence that Lilly made any reference about to Fairfax County Virginia.  *See Matthews*, 534 F.3d at 556 (rejecting as hearsay statements by plaintiff that a prospective employer had told her what a former employer had said).

17

## B.  REMAINING WITHDRAWALS OF CONTINGENT OFFERS

With respect to Welch's remaining allegation of retaliation based on withdrawal of contingent offers from AHRC, Macy's, Cybercoders/American Cybersystems, and a host of other potential employers, Lilly contends that Welch has no admissible evidence to establish that she had contingent job offers from any of these employer, or that anyone at Lilly gave inappropriate references in retaliation for her complaints about discrimination. Specifically, Lilly challenges Welch's evidence from any employer on the grounds that it is hearsay.

Welch asserts that a reasonable jury could infer from Livingston's, Elliott's and Roesner's statements that other statements made by Lilly were similarly damaging. Dkt. No. 76, at 19-20.  Welch argues that this inference is bolstered by the fact that Elliott and Roesner's statements contravened Lilly's policy about providing neutral reference checks for all employees.  *Id.* at 20-21.  Welch also avers that her testimony about the job offers and the timing of their rescission is not hearsay because they are verbal actions, not assertions of fact.  *Id.* at 21-22.

The Court concludes that Welch's evidence is insufficient to show that anyone at Lilly made adverse statements to prospective employers because of her complaints and/or charges of discrimination.  First, Welch's statements about what interviewers or prospective employers told her some nameless employee at Lilly said or even what Elliott or some other "information technology manager" said are hearsay and, therefore, are inadmissible.[9]  Fed. R. Evid. 801(c); *Matthews*, 534 F.3d at 556; *Moreno-Nicholas v.*

---

[9] Welch contends that comments Elliott made would be admissible as non-hearsay admissions of a party opponent; but each part of the statement must be admissible, and

18

*City of Indianapolis*, No. IP 9801398-C-H/G, 2000 WL 1707970, at *2n.1 & *7 (S.D. Ind. Oct. 26, 2000).  Second, even accepting as true that employers contacted Lilly and then contingent offers of employment were withdrawn, Welch cannot show that any statements made by these unnamed persons were motivated in any way by Welch's protected activity.  Not only were the alleged statements made by unnamed persons for which there is no connection to Elliott, Roesner or any other individual Welch claimed had knowledge of her complaints or had previously shown discriminatory animus, any connection to prior statements by Elliott or Roesner is too attenuated in time to be actionable.  *Accord Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 389-90 (7th Cir. 2012) (discussing the effect of temporal proximity on retaliation claims and concluding that six months between the protected activity and an alleged adverse employment action is too far standing alone to be actionable).

For these reasons, Welch's claims that at least eighteen job offers (and potentially others) were rescinded because of adverse employment references by Lilly fail as a matter of law.

---

what the interviewer said is not an admission and it does not fall any other exception to the hearsay rule.

## IV. **CONCLUSION**

For the reasons stated herein, the Court grants Defendant Eli Lilly & Company's Motion for Summary Judgment on the claims brought against it by Plaintiff Cassandra Welch.  Judgment shall enter accordingly.

IT IS SO ORDERED this 24th day of October, 2013.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Benjamin C. Ellis
BETZ & BLEVINS
bellis@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Rozlyn M. Fulgoni-Britton
FAEGRE BAKER DANIELS LLP - Indianapolis
rozlyn.fulgoni-britton@faegrebd.com

Matthew Louis Schmid
SANFORD HEISLER, LLP
mschmid@sanfordheisler.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov